# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JUSTIN M. SONICO, individually and on behalf of all other persons similarly situated,<br><br>                                 Plaintiff,<br><br>     v.<br><br>CHARTER COMMUNICATIONS, LLC, *et al.*,<br><br>                                 Defendants. | Case No. 19-cv-01842-BAS-LL<br><br>**ORDER:**<br><br>**(1) DENYING WITHOUT PREJUDICE DEFENDANTS' MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS [ECF No. 19];**<br><br>**AND**<br><br>**(2) GRANTING LEAVE TO TAKE LIMITED DISCOVERY** |

Plaintiff Justin M. Sonico ("Plaintiff") filed the instant wage-and-hour class action in state court on August 21, 2019. After removing the action to this Court, Defendants filed a Motion to Compel Arbitration and Stay Proceedings ("Motion"). For the reasons stated below, the Court **DENIES WITHOUT PREJUDICE** the Motion and **GRANTS** the parties' leave to conduct further discovery to aid the Court in the resolution of the Motion.

**I.     BACKGROUND**

Plaintiff filed this putative class action in state court alleging violations of various California wage-and-hour laws, which was then removed to this Court on September 25, 2019. (Notice of Removal, ECF No. 1; Compl., Ex A. to Notice of Removal, ECF No. 1-2.)  Defendants Charter Communications, LLC and Charter Communications, Inc.

(collectively, "Defendants" or "Charter") subsequently filed the instant Motion alleging that Plaintiff agreed to arbitrate the underlying claims when he was hired by Time Warner Cable ("TWC") in 2014, which later merged with Charter. (Mot. to Compel Arbitration ("Mot."), ECF No. 19; Mem. of P. & A. in supp. of Mot. ("Mem. of P. & A.") at 1 n.1, ECF No. 19-1.) Below, the Court summarizes the arbitration agreements central to this dispute and both parties' arguments regarding the Motion.

### A. The JAMS Agreement

Defendants claim that Plaintiff signed an arbitration agreement as part of his onboarding process with TWC in December 2016 that requires the claims in his class action lawsuit to proceed to arbitration. (Mot. at 1.) As part of its hiring practices, TWC required applicants for employment to complete an online "onboarding" process. (Decl. of Chance Cassidy ("Cassidy Decl.") ¶ 8, ECF No. 19-2.)[1] This system required applicants to log into TWC's Onboarding System ("OBS") using a unique login identification and a temporary confidential access code available to only the applicant. (*Id.* ¶ 10.)

Once logged in, the applicant was asked to review various policies, including a Mutual Agreement to Arbitrate ("JAMS Agreement") which stated that

> any and all claims, disputes, and/or controversies between you and TWC arising from or related to your employment with TWC shall be submitted exclusively to and determined exclusively by binding arbitration before a single Judicial Arbitration and Mediations Services, Inc. ("JAMS") arbitrator under the Federal Arbitration Act, 9 U.S.C. § 1 et seq. ("FAA").

(*Id.* ¶ 11; JAMS Agreement at 4, Ex. B to Cassidy Decl., ECF No. 19-3.) The JAMS Agreement specifically applies to claims

> (3) under any state law governing Charter's obligation to provide meal, rest, or other breaks, (4) alleging that you were paid improperly or paid insufficient wages, overtime, compensation, or that Charter failed to comply with any law relating to the payment of wages, (5) under any other state law related to your employment with Charter[.]

(JAMS Agreement at 4.) It further included a waiver of all representative, collective, and class actions, allowing employees to pursue claims against Charter only in their individual

---

[1] Mr. Cassidy has been the Senior Director of Charter's Human Resources Service Center since 2017, and states that he has personal knowledge of TWC's personnel recordkeeping and all records maintained in the ordinary court of business regarding Plaintiff's employment with TWC. (*Id.* ¶ 2.)

capacity.  (*Id.* at 4–5.)  It also explained why Charter utilized the JAMS agreement, provided a link to the JAMS alternative dispute resolution website where the applicant could review the JAMS arbitration rules, and allowed the applicant to download a PDF copy of the agreement. (Cassidy Decl. ¶ 12; OBS Webpages at 7–8, Ex. C to Cassidy Decl., ECF No. 19-3.)

Each applicant was then prompted to electronically acknowledge and accept the terms of the Agreement.  (Cassidy Decl. ¶ 13; OBS Webpages at 10.)[2]  The OBS automatically recorded the date and time of each applicant's acceptance of the Agreement's terms. (Cassidy Decl. ¶ 16.)

Plaintiff completed the onboarding process and accepted an online offer for employment with TWC on December 24, 2014. (*Id.* ¶ 9.)  Plaintiff thereafter accepted the JAMS Agreement on December 28, 2014 at 6:45 p.m. using his unique login ID and confidential access code. (*Id.* ¶ 17; Onboarding Status Details for Justin Sonico, Ex. A to Cassidy Decl., ECF No. 19-3.)

**B.    The Solution Channel Agreement**

In 2016, Charter acquired TWC. (Mem. of P. & A. at 1; Cassidy Decl. ¶ 2.)  In 2017, Charter launched Solution Channel, "an updated employment-based legal dispute resolution program."  (Req. to Stip. to Arbitration ("Req.") at 7, Ex. A to Decl. of Max Fischer in supp. of Reply ("Fischer Decl.") ¶ 4, ECF No. 27-2.)  The Solution Channel Program ("Program") establishes equal employment opportunity policies and procedures for reporting and resolving workplace issues.  (Solution Channel Program Guidelines ("Guidelines"), Ex. A to Decl. of Megan McDonough ("McDonough Decl."), ECF No. 27-5.)  The Guidelines contain an enumerated list of "General Rules" stating that participation in the Program was "a condition of working at Charter" and specifically providing the following:

---

[2] Mr. Cassidy attests that the webpages contained in Exhibit C "are identical to the OBS webpages in effect in December 2014, and are therefore identical to the webpages Plaintiff saw when he completed the onboarding process." (Cassidy Decl. ¶ 15.)

>Upon implementation of Solution Channel, current employees will be provided a 30-day opt-out period. Those employees will be covered by Solution Channel unless they opt out. Those employees covered by a collective bargaining agreement or other employment agreement are excluded from Solution Channel unless expressly allowed under those agreements (although nothing in this document shall limit the applicability of any arbitration or other dispute resolution provision contained in those agreements).

(*Id.* at 8, 13.) Current employees were enrolled in the Program unless they opted out. (*Id.* at 13.) The Guidelines do not provide instructions about how to opt out or affirmatively consent to participation in the program.

The Mutual Arbitration Agreement—referred to herein as the Solution Channel Agreement ("SCA")—is included as part of the Guidelines. Like the JAMS Agreement, it requires that claims arising from employment disputes with Charter be submitted to arbitration and bars claims from being brought in a representative, collective, or class action. (SCA §§ B.1, D, Ex. A to McDonough Decl.)[3] The SCA states that both the employee and Charter "mutually agree" to these terms as a condition of employment. (*Id.* § A.) The SCA also states that it constitutes "the complete agreement of the parties on the subject of resolution of the covered disputes, and supersedes any prior or contemporaneous oral or written understanding on this subject[.]" (*Id.* § P.) Finally, the SCA establishes that it is effective "as of the date of [the employee's] consent to participate in Solution Channel." (*Id.* § V.) The SCA has no place for an employee to sign or otherwise indicate his or her mutual assent to its terms.

Defense counsel disclosed the existence of the SCA, and Plaintiff's decision to opt out of the same, during the Early Neutral Evaluation Conference ("ENE") before Magistrate

---

[3] The SCA also states that parties bound to the agreement also mutually agree to submit to arbitration "all disputes related to the arbitrability of any claim or controversy." (*Id.* § B.3.) "[P]arties can agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 68–69 (2010). "However, courts should not assume that the parties agreed to arbitrate arbitrability unless there is "clea[r] and unmistakabl[e]" evidence that they did so." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 939 (1995). Because, as explained below, there is no clear and unmistakable evidence that the parties agreed to the SCA in this case—indeed, both parties maintain that Plaintiff opted out—the Court does not find that the parties are bound to present the arbitrability questions in this Motion to the arbitrator.

Judge Lopez on October 31, 2019.  (Pl.'s Opp'n to Defs.' Mot. ("Opp'n") at 4, ECF No. 26.)  Defendants produced a general copy of the SCA, but no contract specific to Plaintiff or documents reflecting his decision to opt out.  (*Id.*)

### C. Parties' Arguments

Defendants move to compel arbitration on the basis that Plaintiff entered into a valid, enforceable arbitration agreement when he accepted the JAMS Agreement during his onboarding process with TWC, and that the instant claims fall squarely within the scope of the Agreement.  (*See* Mem. of P. & A. at 3–4.)  Defendants have maintained that "Plaintiff never entered into and is not bound by" the SCA because he opted out of it in 2017, leaving the JAMS Agreement in effect and Plaintiff bound to its terms.  (Reply in supp. of Mot. ("Reply") at 3–4, ECF No. 27.)

Plaintiff argues that the Court cannot resolve the Motion without ordering Defendants to produce Plaintiff's specific SCA, because "[i]f a subsequent arbitration agreement was in effect and opted out of by Plaintiff, the JAMS Arbitration would then be inoperative in this instance as it would have been superseded."  (Opp'n at 6–8.)  Plaintiff also argues that Defendants have waived their right to arbitration by engaging in "acts wholly inconsistent with the right to arbitrate" which have prejudiced Plaintiff.  (Opp'n at 8.)  Lastly, Plaintiff contends that even if the JAMS Agreement controls, the Motion should be denied because the JAMS Agreement is procedurally and substantively unconscionable.  (*Id.* at 9–14.)

## II. LEGAL STANDARD

The Federal Arbitration Act ("FAA") applies to contracts involving interstate commerce.  9 U.S.C. §§ 1, 2.  The FAA provides that contractual arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  *Id.* § 2.  The primary purpose of the FAA is to ensure that "private agreements to arbitrate are enforced according to their terms."  *Volt Info. Scis., Inc. v. Bd. of Trs. of the Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989).  Therefore, "as a matter of federal law, any doubts concerning the scope of arbitrable issues

should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983).

Given this strong federal preference for arbitration and the contractual nature of arbitration agreements, "a district court has little discretion to deny an arbitration motion" once it determines that a claim is covered by a written and enforceable arbitration agreement. *Republic of Nicar. v. Standard Fruit Co.*, 937 F.2d 469, 475 (9th Cir. 1991). "In determining whether to compel a party to arbitration, a district court may not review the merits of the dispute[.]" *Esquer v. Educ. Mgmt. Corp.*, — F. Supp. 3d —, 2017 WL 5194635, at *2 (S.D. Cal. Nov. 9, 2017).

However, "question[s] of arbitrability" include "certain gateway matters" that are "presumptively for courts to decide[.]" *Oxford Health Plans LLC v. Sutter*, 133 S. Ct. 2064, 2068 n.2 (2013); *see also Momot v. Mastro*, 652 F.3d 982, 987 (9th Cir. 2011) (identifying "gateway questions of arbitrability" to include "whether the parties have a valid arbitration agreement or are bound by a given arbitration clause, and whether an arbitration clause in a concededly binding contract applies to a given controversy"); *Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201, 1208 (9th Cir. 2016) ("[T]here is a presumption that courts will decide which issues are arbitrable; the federal policy in favor of arbitration does not extend to deciding questions of arbitrability."). Thus, a district court must determine (1) whether a valid arbitration agreement exists and, if so, (2) whether the agreement covers the relevant dispute. *See* 9 U.S.C. § 4; *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015) (citing *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002)).

**III. ANALYSIS**

For the reasons stated below, the Court first finds that Defendants' actions thus far in the litigation have not waived their right to arbitration. Then, turning to the question of which arbitration agreement, if any, controls in this case, the Court determines that further discovery is necessary to decide the question.

### A. Waiver

The Court first addresses Plaintiff's argument that Defendants, by their actions, have waived their right to arbitration. Plaintiff contends Defendants have acted inconsistently with their right to arbitrate and prejudiced Plaintiff by: (1) moving to compel arbitration "months after" Plaintiff filed the action in state court; (2) "actively selecting this venue" by removing the case to federal court; (3) participating in the ENE and discussing settlement; and (4) engaging in discovery by submitting proposed protective orders and participating in the *Belaire-West* process. (Opp'n at 8–9.)

A party seeking to prove that the right to compel arbitration has been waived must demonstrate: "(1) knowledge of an existing right to compel arbitration; (2) intentional acts inconsistent with that existing right; and (3) prejudice to the person opposing arbitration from such inconsistent acts." *Newirth by & through Newirth v. Aegis Senior Communities, LLC*, 931 F.3d 935, 940 (9th Cir. 2019) (citing *Fisher v. A.G. Becker Paribas Inc.*, 791 F.2d 691, 694 (9th Cir. 1986)). Because waiver of a contractual right to arbitration is not favored, "any party arguing waiver of arbitration bears a heavy burden of proof." *Fisher*, 791 F.2d at 694.

"There is no concrete test to determine whether a party has engaged in acts that are inconsistent with its right to arbitrate[.]" *Martin v. Yasuda*, 829 F.3d 1118, 1125 (9th Cir. 2016). Instead, courts consider whether the totality of the parties' actions "indicate a conscious decision . . . to seek judicial judgment on the merits of [the] arbitrable claims, which would be inconsistent with a right to arbitrate." *Id.* In other words, "a party acts inconsistently with exercising the right to arbitrate when it (1) makes an intentional decision not to move to compel arbitration and (2) actively litigates the merits of a case for a prolonged period of time in order to take advantage of being in court." *Newirth*, 931 F.3d 935 at 941. Further, prejudice results only "[w]hen a party has expended considerable time and money due to the opposing party's failure to timely move for arbitration and is then deprived of the benefits for which it has paid by a belated motion to compel[.]" *Martin*, 829 F.3d at 1127.

Here, Defendants moved to compel arbitration exactly three months after Plaintiff commenced this action in state court, and one month after Plaintiff refused to submit to arbitration. (*See* Compl.; Mot.)  This delay does not support a finding of waiver. *See also Chartwell Staffing Servs. Inc. v. Atl. Sols. Grp. Inc.*, No. 8:19-CV-00642-JLS-JDE, 2020 WL 620294, at *9 (C.D. Cal. Jan. 9, 2020) (finding a three-month delay in filing a motion to compel arbitration "wholly insufficient to support a finding of waiver" and noting that when finding waiver, "the Ninth Circuit identified delays ranging from nine to eighteen months") (citing *Kelly v. Pub. Util. Dist. No. 2 of Grant Cty.*, 552 F. App'x 663, 664 (9th Cir. 2014)).[4]  Moreover, in the three months that elapsed between the filing of the case and Defendants' Motion, the parties submitted a four-page Rule 26(f) Report (ECF No. 12) and a protective order that Defendants clearly stated was contingent on "the outcome of Defendant[s'] forthcoming motion to compel arbitration[.]"   (ECF No. 17 at 2.) Defendants' conduct therefore evinces no "conscious decision" to litigate arbitrable claims in federal court, nor has any significant amount of time and money has been expended on substantive motions such that Plaintiff has been prejudiced.[5]  *Van Ness Townhouses*, 862 F.2d at 759; *see also Kelly*, 552 F. App'x at 664; *Martin*, 829 F.3d at 1127.

In any event, much of Defendants' actions cited by Plaintiff appear to be responsive to court orders.  Defendants attempted to continue the Early Neutral Evaluation (ENE) specifically because the parties were engaged in an ongoing meet-and-confer about arbitration, but the request was denied, necessitating their appearance and meaningful participation at the conference. (ECF Nos. 10, 11.)  Further, after the ENE, the Magistrate Judge Lopez set a deadline of November 20, 2019 for the parties to file the joint motion for a protective order; Defendants filed their Motion to Compel Arbitration the next day. (ECF Nos. 17, 19.)  The Court does not find such actions, taken to comply with court orders standard in the preliminary stages of a case, sufficient for waiver.

---

[4] *See Martin*, 829 F.3d at 1126 (17 months); *Van Ness Townhouses v. Mar Indus. Corp.*, 862 F.2d 754, 759 (9th Cir. 1988) (two years); *Plows v. Rockwell Collins, Inc.*, 812 F. Supp. 2d 1063, 1068 (C.D. Cal. 2011) (13 months).

[5] Moreover, Plaintiff has himself confirmed that Defendants have refrained from engaging in discovery, citing that they have failed to respond to written discovery propounded in November.  (Opp'n at 7.)

Lastly, "where the defendant has not engaged in protracted litigation or obtained discovery," a defendant's decision to remove an action to federal court has generally not been considered inconsistent with the right to arbitrate and does not prejudice the opposing party. *Moffett v. Recording Radio Film Connection, Inc.*, No. CV 19-3319 PSG (KSx), 2019 WL 6898955, at *6 (C.D. Cal. Oct. 4, 2019) (quoting *DeMartini v. Johns*, No. 3:12-CV-03929-JCS, 2012 WL 4808448, at *5 (N.D. Cal. Oct. 9, 2012)). This is particularly true in cases where a defendant removed an action pursuant to CAFA. *See Morvant v. P.F. Chang's China Bistro, Inc.*, 870 F. Supp. 2d 831, 846 (N.D. Cal. 2012) ("Plaintiffs argue that removal pursuant to CAFA is logically irreconcilable with the intent to arbitrate based upon an erroneous assumption that such removal amounts to an admission that this action is suitable to class treatment . . . [r]emoval does not serve as an admission of those allegations"); *see also Armstrong v. Michaels Stores, Inc.*, No. 17-CV-06540-LHK, 2018 WL 6505997, at *10 (N.D. Cal. Dec. 11, 2018) (finding removal under CAFA cannot constitute waiver because such class actions are "subject to the original jurisdiction" of federal courts and thus "can *only* be heard in federal court").

Considering the totality of Defendants' actions, the Court does not conclude that Defendants have acted inconsistently with their right to arbitrate or otherwise taken advantage of litigating their claims in court, resulting in any prejudice to Plaintiff. Accordingly, the Court finds Defendants have not waived their right to arbitration.

### B. Controlling Agreement

Having addressed waiver, the Court now turns to the merits of the Motion. The key issue is whether Plaintiff's purported opt-out decision renders the JAMS Agreement—on which Defendants' Motion is based—inoperable, or whether the opt-out decision revives it. Defendants' position is that because Plaintiff opted out of the SCA without entering into it, the SCA does not supersede the JAMS Agreement. (Reply at 3.) Plaintiff, however, claims that the parties did, in fact "enter[] into a subsequent arbitration agreement" that supersedes the JAMS Agreement. (Opp'n at 7.)

To determine whether the parties agreed to the SCA, the Court must apply "ordinary state-law principles that govern the formation of contracts." *Norcia v. Samsung Telecomms. Am., LLC*, 845 F.3d 1279, 1283 (9th Cir. 2017) (internal quotations omitted). "Contract formation requires mutual consent, which cannot exist unless the parties 'agree on the same thing in the same sense.'" *Rockridge Tr. v. Wells Fargo, N.A.*, 985 F. Supp. 2d 1110, 1142 (N.D. Cal. 2013) (quoting *Bustamante v. Intuit, Inc.*, 141 Cal. App. 4th 199, 208 (2006)). "Mutual assent may be manifested by written or spoken words, or by conduct." *Binder v. Aetna Life Ins. Co.*, 75 Cal. App. 4th 832, 844 (1999).

Here, however, Plaintiff provides no evidence to support that Plaintiff agreed to the SCA and subsequently opted out, and Defendants provide no evidence that Plaintiff opted out without agreeing to the SCA. *See Arredondo v. Sw. & Pac. Specialty Fin., Inc.*, No. 1:18-cv-01737-DAD-SKO, 2019 WL 4596776, at *6 (E.D. Cal. Sept. 23, 2019) (citing plaintiff's declaration and written opt-out to support finding that she signed a dispute resolution agreement before she opted out). Instead, Plaintiff claims Defendants' outstanding answers to discovery "confirm[] the existence that Plaintiff has opted out of the subsequent arbitration agreement rendering the 2014 JAMS agreement inoperable" and therefore requests that the Court order Defendants to respond to arbitration-related discovery propounded by Plaintiff. (Opp'n at 7.)

The FAA provides for discovery in connection with a motion to compel arbitration only if "'the making of the arbitration agreement . . . be in issue.'" *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 726 (9th Cir. 1999) (citing *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403–04 (1967)). At minimum, this includes the arbitration provisions themselves. *See Meyer v. T-Mobile USA Inc.*, 836 F. Supp. 2d 994, 1007 (N.D. Cal. 2011) (denying request for arbitration-related discovery where contracts containing the arbitration provisions at issue were already available to the parties and the court); *Laguna v. Coverall N. Am., Inc.*, No. 09CV2131-JM BGS, 2011 WL 3176469, at *8 (S.D. Cal. July 26, 2011) (denying request for arbitration-related discovery where defendants "produced the arbitration clauses for each named Plaintiff that is currently subject to a motion to compel

arbitration"). This also includes a party's decision to opt out of an arbitration agreement. *See Erwin v. Citibank, N.A.*, No. 3:16-CV-03040-GPC-KSC, 2017 WL 1047575, at *4 (S.D. Cal. Mar. 20, 2017) ("[W]hether or not Plaintiff opted out of the 2015 Arbitration Agreement is dispositive of the first gateway question of arbitrability—it goes to the very heart of whether an agreement to arbitrate exists.").

Here, determinations about Plaintiff's entry into the SCA and his decision to opt out of the SCA are dispositive of Defendants' Motion. However, neither the SCA nor evidence of an opt-out specific to the named Plaintiff is before the Court. Thus, the Court finds Plaintiff's request for discovery appropriate and orders the parties to conduct discovery pertaining only to the specific SCA between Plaintiff and Defendant, should it exist, and to Plaintiff's decision to opt out of the SCA. Defendants' participation in this discovery will not be construed as a waiver of their right to arbitrate.

## IV. CONCLUSION

For the foregoing reasons, the Court **DENIES WITHOUT PREJUDICE** Defendants' Motion to Compel Arbitration and Stay Proceedings (ECF No. 19) and **GRANTS** the parties until **May 20, 2020** to take limited discovery related to the SCA specific to Plaintiff and Plaintiff's decision to opt-out of the SCA. The parties are directed to contact the Magistrate Judge's chambers with any discovery management issues or concerns. Defendants may renew their motion to compel arbitration within five days of the conclusion of discovery.

**IT IS SO ORDERED.**

**DATED: April 20, 2020**

Hon. Cynthia Bashant
United States District Judge