# UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JUSTIN M. SONICO, individually and on behalf of all other persons similarly situated,<br><br>                                    Plaintiff,<br><br>     v.<br><br>CHARTER COMMUNICATIONS, LLC, *et al.*,<br><br>                                    Defendants. | Case No. 19-cv-01842-BAS-LL<br><br>**ORDER GRANTING RENEWED MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS**<br><br>**(ECF No. 36)** |

Pursuant to the Court's previous Order (ECF No. 32), Defendants have filed a Renewed Motion to Compel Arbitration and Stay Proceedings ("Renewed Motion") in this action. (ECF No. 36.) Plaintiff opposes, and Defendants reply. (ECF Nos. 37, 38.) The Court finds this motion suitable for determination on the papers submitted and without oral argument. *See* Civ.LR 7.1(d)(1). For the reasons stated below, the Court **GRANTS** the Renewed Motion.

## I.     BACKGROUND

Plaintiff filed this putative class action in state court alleging violations of various California wage-and-hour laws, which was then removed to this Court on September 25, 2019. (Notice of Removal, ECF No. 1; Compl., Ex A. to Notice of Removal, ECF No. 1-2.) Defendants Charter Communications, LLC and Charter Communications, Inc. (collectively, "Defendants" or "Charter") initially moved to compel arbitration because Plaintiff agreed to arbitrate the underlying claims when he was hired by Time Warner Cable ("TWC") in 2014, which later merged with Charter. (Mot. to Compel Arbitration ("Mot."),

ECF No. 19.)  Plaintiff opposed on the basis that he opted out of a subsequent arbitration agreement (the "Solution Channel Agreement" or "SCA") presented to employees after TWC merged with Charter in 2016.  (Opp'n to Mot., ECF No. 26.)  Plaintiff argued that he entered into the SCA before opting out and it therefore superseded the first arbitration agreement, while Defendants maintained that Plaintiff's opt-out left the first agreement in effect.  (*See* Order Re: Mot. to Compel Arbitration ("Order") at 5, ECF No. 32.)

Because the SCA and opt-out notice specific to Plaintiff were not before the Court, leaving open questions about the agreement's formation, the Court ordered the parties to engage in limited discovery and permitted Defendants to renew their motion within five days of the conclusion of the discovery process.  (*Id.* at 11.)  Defendants' Renewed Motion attaches the Solution Channel Program Guidelines ("Guidelines"), the SCA, and Plaintiff's Electronic Opt-Out Acknowledgement.  (*See* Exs. C, F to Decl. of John Fries in supp. of Renewed Mot. ("Fries Decl.").)[1]  The Court once again summarizes the two agreements below, including the supplemental information provided in the Renewed Motion about the SCA and Plaintiff's opt-out.

A.   **The JAMS Agreement**[2]

Defendants claim that Plaintiff signed an arbitration agreement as part of his onboarding process with TWC in December 2014 that requires the claims in his class action lawsuit to proceed to arbitration.[3]  (Mot. at 1.)  As part of its hiring practices, TWC required applicants for employment to complete an online "onboarding" process.  (Decl. of Chance

---

[1] John Fries is the Vice President, HR Technology for Charter Communications.  (*Id.* ¶ 1.)  He is "responsible for data reporting sourced from PeopleSoft, a system used by Charter to electronically collect, maintain, and report on employee information[.]"  (*Id.*)  All exhibits are attached to the Fries Declaration as ECF No. 36-2.

[2] The JAMS Agreement was submitted only with Defendants' initial Motion.  The Court adopts the summary of the JAMS Agreement and portions of its summary of the SCA included in its original Order on the Motion.  (Order at 2–3.)

[3] The JAMS Agreement applies to disputes with TWC and its "parents, subsidiaries, affiliates, successors, and assigns," which Defendants claim covers both Charter Communications, Inc. and Charter Communications, LLC.  (Mot. at 3.)  Plaintiff does not dispute this.

Cassidy ("Cassidy Decl.") ¶ 8, ECF No. 19-2.)[4]  This system required applicants to log into TWC's Onboarding System ("OBS") using a unique login identification and a temporary confidential access code available to only the applicant.  (*Id.* ¶ 10.)

Once logged in, the applicant was asked to review and accept 12 "required acknowledgments," the last of which was the JAMS Agreement.  (*Id.* ¶ 11; Onboarding Status Details, Ex. A to Cassidy Decl.)  The JAMS Agreement states:

> By accepting employment with [TWC], you and [TWC] . . . agree that any and all claims, disputes, and/or controversies between you and TWC arising from or related to your employment with TWC shall be submitted exclusively to and determined exclusively by binding arbitration before a single Judicial Arbitration and Mediations Services, Inc. ("JAMS") arbitrator under the Federal Arbitration Act, 9 U.S.C. § 1 et seq. ("FAA").

(*Id.* ¶ 11; JAMS Agreement at 4, Ex. B to Cassidy Decl., ECF No. 19-3.[5])  The JAMS Agreement specifically applies to claims

> (3) under any state law governing Charter's obligation to provide meal, rest, or other breaks, (4) alleging that you were paid improperly or paid insufficient wages, overtime, compensation, or that Charter failed to comply with any law relating to the payment of wages, [and] (5) under any other state law related to your employment with Charter[.]

(JAMS Agreement at 4.)  It further includes a waiver of all representative, collective, and class actions, allowing employees to pursue claims against Charter only in their individual capacity.  (*Id.* at 4–5.)

The OBS explained why Charter utilized the JAMS agreement, provided a link to the JAMS alternative dispute resolution website where the applicant could review the JAMS arbitration rules, and allowed the applicant to download a PDF copy of the agreement.  (Cassidy Decl. ¶ 12; OBS Webpages at 7–8, Ex. C to Cassidy Decl.)  Each

---

[4] Mr. Cassidy has been the Senior Director of Charter's Human Resources Service Center since 2017, and states that he has personal knowledge of TWC's personnel recordkeeping and access to all records maintained in the ordinary course of business regarding Plaintiff's employment with TWC.  (*Id.* ¶ 2.)

[5] All exhibits are attached to the Cassidy Declaration as ECF No. 19-3.

1    applicant was then prompted to electronically acknowledge and accept the terms of the

2    Agreement.  (Cassidy Decl. ¶ 13; OBS Webpages at 10.)[6]  The OBS automatically recorded

3    the date and time of each applicant's acceptance of the Agreement's terms.  (Cassidy Decl.

4    ¶ 16.)

5            Plaintiff completed the onboarding process and accepted an online offer for

6    employment with TWC on December 24, 2014.  (*Id.* ¶ 9.)  Plaintiff thereafter accepted the

7    JAMS Agreement on December 28, 2014, at 6:45 p.m. using his unique login ID and

8    confidential access code.  (*Id.* ¶ 17; Onboarding Status Details for Justin Sonico, Ex. A to

9    Cassidy Decl.)

10           **B.    The Solution Channel Agreement**

11           In 2016, Charter acquired TWC.  (Mot. at 1; Cassidy Decl. ¶ 2.)  In 2017, Charter

12   launched Solution Channel, an exclusive means of resolving pre-employment or

13   employment-related legal disputes through a multi-step claims process that culminates, if

14   necessary, in a final and binding arbitration.  (Guidelines at 8–9.)  Through this program, a

15   claimant submits a dispute via a web-based portal and, if covered, it is first reviewed

16   internally by Charter, which issues a decision to the claimant by email.  (*Id.* at 10.)  If the

17   claimant does not agree with the decision, the claimant can elect to proceed to arbitration.

18   (*Id.*)  The SCA formally binds both parties to arbitration in the event this internal review

19   procedure does not resolve the claim.

20           Links to both the SCA and the Guidelines were accessible to employees on a Charter

21   intranet site called Panorama.  (Fries Decl. ¶ 9; Panorama webpage at 2, Ex. B to Fries

22   Decl.)

23           **1.    Agreement to Arbitrate**

24           Like the JAMS Agreement, the SCA requires claims arising from employment

25   disputes with Charter to be submitted to arbitration and bars claims from being brought in

26

27           [6] Mr. Cassidy attests that the webpages contained in Exhibit C "are identical to the OBS webpages
     in effect in December 2014, and are therefore identical to the webpages Plaintiff saw when he completed
28   the onboarding process."  (Cassidy Decl. ¶ 15.)

a representative, collective, or class action.  (SCA §§ B.1, D.)  The SCA states that both the employee and Charter "mutually agree" to these terms as a condition of employment.  (*Id.* § A.)  The SCA also states that it constitutes "the complete agreement of the parties on the subject of resolution of the covered disputes, and supersedes any prior or contemporaneous oral or written understanding on this subject[.]"  (*Id.* § P.)

Finally, the SCA establishes that it is effective "as of the date of [the employee's] consent to participate in Solution Channel."  (*Id.* § V.)  The SCA has no place for an employee to sign or otherwise indicate mutual assent to its terms.

### 2.    Solution Channel Guidelines

The Guidelines explain the Solution Channel dispute resolution process, including arbitration.  They contain an enumerated list of "General Rules" stating that "participation in Solution Channel is a condition of consideration for employment with Charter, and a condition of working at Charter."  (*Id.* at 8, 13.)  They also specifically provide:

> Upon implementation of Solution Channel, current employees will be provided a 30-day opt-out period. Those employees will be covered by Solution Channel unless they opt out. Those employees covered by a collective bargaining agreement or other employment agreement are excluded from Solution Channel unless expressly allowed under those agreements (although nothing in this document shall limit the applicability of any arbitration or other dispute resolution provision contained in those agreements).

(*Id.* at 8, 13.)  Another section of the Guidelines reiterates that "[c]urrent employees at the effective date of Solution Channel will be enrolled in the Program, unless the employee opts out."  (*Id.* at 13.)

### 3.    Plaintiff's Opt-Out

Charter's intranet webpage also included a link to a webpage allowing employees to elect to opt out of Solution Channel.  (*See* Fries Decl. ¶¶ 11–13; Ex. D to Fries Decl.)  The Electronic Opt-Out Acknowledgement included the following statement:

19cv1842

> After having carefully considered its components, I am opting out of Solution Channel.  By opting out, I understand and agree that I am not required to participate in Solution Channel.  I also understand that if I am already subject to another arbitration agreement, I will remain subject to that agreement.  I am only opting out of Solution Channel by completing this form.
>
> I ALSO UNDERSTAND THAT IF I DO NOT OPT OUT, I AM SPECIFICALLY CONSENTING TO PARTICIPATION IN SOLUTION CHANNEL.

(Ex. D to Fries Decl.)  Employees could then check a box next to "I want to opt out of Solution Channel," enter their name, and click "Save" to record their opt-out.  (Fries Decl. ¶ 14.)

In their Renewed Motion, Defendants now provide documentary evidence establishing Plaintiff's receipt of the SCA and his subsequent decision to opt out.  On October 6, 2017, Charter's Executive Vice President Paul Marchand announced via email the implementation of the Solution Channel program to "all non-union employees below the level of Executive Vice President, who were active, or who were not on a leave of absence, on that date[.]"  (Fries Decl. ¶ 5; SCA email, Ex. A to Fries Decl.)  The email noted: "Unless you opt out of participating in Solution Channel within the next 30 days, you will be enrolled. Instructions for opting out of Solution Channel are also located on Panorama."  (Fries Decl. ¶ 8; SCA email.)  The email also included a link to the Solution Channel web page on the Charter website, which in turn included a link to access the SCA. (Fries Decl. ¶¶ 9, 10; Solution Channel webpage, Ex. B to Fries Decl.; SCA, Ex. C to Fries Decl.)[7]

---

[7] Fries attests that this webpage also included a clause about opting out of the SCA, which stated the following:

**Opting Out of Solution Channel**

If you do not opt out of Solution Channel within the designated time, you will be automatically enrolled in Solution Channel and considered to have consented to the terms of the Mutual Arbitration Agreement at that time. To opt-out of Solution Channel, please

1    Employees could opt out of Solution Channel using network credentials to access a
2    system called PeopleSoft.  (Fries Decl. ¶¶ 13–14; PeopleSoft Solution Channel Page, Ex.
3    D to Fries Decl.)   Charter maintains a record of employees who opted out of Solution
4    Channel within the 30-day period.  (Fries Decl. ¶ 18.)  John Fries, as Vice President, HR
5    Technology, has attested that he has access to this and other employment records and
6    confirmed that Plaintiff: (1) was a Charter employee on October 6, 2017; (2) was included
7    in the distribution list for the email sent by Paul Marchand announcing the Solution Channel
8    program; and (3) opted out of Solution Channel on October 18, 2017.  (*Id.* ¶¶ 19–21; SCA
9    email to Sonico, Ex. E to Fries Decl., ECF No. 36-2; Sonico's Electronic Opt-Out
10   Acknowledgment, Ex. F to Fries Decl., ECF No. 36-2.)   The parties agree that Plaintiff
11   timely opted out of the SCA.

## II.   LEGAL STANDARD

13       The Federal Arbitration Act ("FAA") applies to contracts involving interstate
14   commerce.[8] 9 U.S.C. §§ 1, 2.  The FAA provides that contractual arbitration agreements
15   "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in
16   equity for the revocation of any contract."  *Id.* § 2.  The primary purpose of the FAA is to
17   ensure that "private agreements to arbitrate are enforced according to their terms."  *Volt*
18   *Info. Scis., Inc. v. Bd. of Trs. of the Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989).
19   Therefore, "as a matter of federal law, any doubts concerning the scope of arbitrable issues
20   should be resolved in favor of arbitration."  *Moses H. Cone Mem'l Hosp. v. Mercury Constr.*
21   *Corp.*, 460 U.S. 1, 24–25 (1983).

---

**click here**. In the new window that will open, click Main Menu->Self-Service->Solution
Channel.

(Fries Decl. ¶ 11.)  Fries states that the link led to the page where employees could elect to opt-out of the
SCA.  This webpage is not attached and is presumably one of the Panorama webpages that allegedly
existed during the opt-out window but cannot not be recovered by Charter.  (*See* Fries Decl. ¶ 22.)

[8] The FAA encompasses "contract[s] evidencing a transaction involving commerce to settle by
arbitration."  9 U.S.C. § 2.  "Commerce" is defined as "commerce among the several States."  *Id.* § 1;
*Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56 (2003) (citation omitted).  Charter's representation that it
is engaged in interstate commerce is undisputed.  (Renewed Mot. at 8–9.)

Given this strong federal preference for arbitration and the contractual nature of arbitration agreements, "a district court has little discretion to deny an arbitration motion" once it determines that a claim is covered by a written and enforceable arbitration agreement. *Republic of Nicar. v. Standard Fruit Co.*, 937 F.2d 469, 475 (9th Cir. 1991). "In determining whether to compel a party to arbitration, a district court may not review the merits of the dispute[.]" *Esquer v. Educ. Mgmt. Corp.*, 292 F. Supp. 3d 1005, 1010 (S.D. Cal. 2017).

However, "question[s] of arbitrability" include "certain gateway matters" that are "presumptively for courts to decide[.]" *Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 569 n.2 (2013); *see also Momot v. Mastro*, 652 F.3d 982, 987 (9th Cir. 2011) (identifying "gateway questions of arbitrability" to include "whether the parties have a valid arbitration agreement or are bound by a given arbitration clause, and whether an arbitration clause in a concededly binding contract applies to a given controversy"); *Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201, 1208 (9th Cir. 2016) ("[T]here is a presumption that courts will decide which issues are arbitrable; the federal policy in favor of arbitration does not extend to deciding questions of arbitrability."). Thus, a district court must determine (1) whether a valid arbitration agreement exists and, if so, (2) whether the agreement covers the relevant dispute. *See* 9 U.S.C. § 4; *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015) (citing *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002)).

## III.   ANALYSIS

As before, the primary dispute centers around whether any arbitration agreement covers the underlying dispute between the parties. Defendants argue that Plaintiff's opt-out was effectively a rejection of the offer made in the SCA, leaving the JAMS Agreement as the existing arbitration contract between the parties. (Renewed Mot. at 11–12.) In opposition, Plaintiff maintains that the language of the SCA itself, the Guidelines, and Plaintiff's personal understanding support that the SCA was operable "upon conveyance to the employee." (Opp'n at 6.) Thus, Plaintiff argues that the SCA was effective as of October 6, 2017, superseded the JAMS Agreement on this date, and then was subsequently

rendered non-binding on Plaintiff when he opted out on October 18, 2017, leaving no arbitration agreement between the parties.

For the reasons stated below, the Court first finds that Plaintiff did not enter into the SCA such that it supersedes the JAMS Agreement.  Second, the Court finds that the JAMS Agreement is not procedurally or substantively unconscionable and therefore is enforceable.

### A.    Controlling Agreement

The question here is whether a subsequent agreement, the SCA, was formed between the parties such that it supersedes the JAMS Agreement.  "It is a well settled principle of contract law that a new agreement between the same parties on the same subject matter supersedes the old agreement."  *Mumin v. Uber Techs., Inc.*, 239 F. Supp. 3d 507, 524 (E.D.N.Y. 2017).  To determine whether a superseding agreement was formed, courts must apply "ordinary state-law principles that govern the formation of contracts."  *Norcia v. Samsung Telecomms. Am., LLC*, 845 F.3d 1279, 1283 (9th Cir. 2017) (internal quotations omitted).  California Civil Code § 1550 requires four elements for contract formation: "(1) parties capable of contracting; (2) their consent; (3) a lawful object; and (4) a sufficient cause or consideration."  *Shaw v. Regents of Univ. of Calif.*, 58 Cal. App. 4th 44, 52 (1997) (quoting *Marshall & Co. v. Weisel*, 242 Cal. App. 2d 191, 196 (1966)).  At issue in this case is whether Plaintiff consented to the terms of the SCA before opting out.

"Every contract requires the mutual assent or consent of the parties."  *Meyer v. Benko*, 55 Cal. App. 3d 937, 942 (1976).  "Mutual assent is determined under an objective standard applied to the outward manifestations or expressions of the parties, i.e., the reasonable meaning of their words and acts, and not their unexpressed intentions or understandings."  *Alexander v. Codemasters Grp. Ltd.*, 104 Cal. App. 4th 129, 141 (2002).  It is typically "manifested by an offer communicated to the offeree and an acceptance communicated to the offeror."  *Donovan v. RRL Corp.*, 26 Cal. 4th 261, 271 (2001).  In the case of a written contract, a party's assent can be manifested by a signature or through conduct.  *See Marin Storage & Trucking, Inc. v. Benco Contracting & Eng'g, Inc.*, 89 Cal.

App. 4th 1042, 1049 (2001) ("[O]rdinarily one who signs an instrument which on its face is a contract is deemed to assent to all its terms."); *Esparza v. KS Indus., L.P.*, 13 Cal. App. 5th 1228, 1238 (2017) ("Under California law, consent to a written contract may be implied by conduct.").

Here, Plaintiff did not sign the SCA, and it is undisputed that Plaintiff opted out via an Electronic Opt-Out Acknowledgement.  (Ex. F to Fries Decl.)  Thus, the Court must determine if Plaintiff manifested mutual assent to the SCA when he received the email on October 6, 2017 and before he exercised his opt-out option on October 18, 2017.  The Court finds that he did not.

First, Plaintiff does not allege that he conducted himself in a way that demonstrated assent to the terms of the SCA.  Regarding his own actions, he states only that "he believed that the SCA was already implemented by the company and therefore believed the new arbitration program to be operable and in effect prior to his decision to opt-out . . . ." (Opp'n at 6; Am. Decl. of Justin Sonico in supp. of Opp'n ("Sonico Decl.") ¶¶ 9–10, ECF No. 37-1.)  Such "unexpressed intentions or understandings," without allegations that he took any action or conducted himself consistent with this understanding, are not sufficient for mutual assent.  *See Alexander*, 104 Cal. App. 4th at 141; *see also Norcia*, 845 F.3d at 1285–86 ("Under California law, an offeree's inaction after receipt of an offer is generally insufficient to form a contract.").

Second, Plaintiff alleges that the provision of the SCA making the agreement effective "as of the date of [his] consent to participate in Solution Channel" establishes that it became effective only "upon conveyance to the employee[.]"  (Opp'n at 6.)  The Court disagrees.  Other language in the documents accompanying the SCA indicate that Plaintiff's "consent to participate" was contingent on his decision whether to opt-out, not his receipt of the agreement.  For example, the Electronic Opt-Out Acknowledgement expressly states that Plaintiff's opt-out applied only to the SCA and that failing to opt out—not simply receiving the SCA—constituted "specific[] consent[] to participation in Solution Channel."  (*See* Exs. C, F to Fries Decl.)  Further, Defendants also present evidence that the SCA email

and the Program Guidelines established that Plaintiff would be "enrolled" in Solution Channel *unless* he opted out.  (*See* SCA email to Sonico at 2 ("Unless you opt out of participating in Solution Channel within the next 30 days, you will be enrolled."); Program Guidelines at 13 ("Current employees at the effective date of Solution Channel will be enrolled in the Program, unless the employee opts out.").)[9]  Taken together, the SCA and related documents indicate that Plaintiff's mutual assent to Solution Channel and his enrollment in the program were to be established not by Plaintiff's receipt of the SCA, but by his failure to timely opt out.

Existing case law regarding opt-outs supports this view.  Timely opting out of an agreement has generally been understood to be a rejection of an offer.  *See Sawyer v. Bill Me Later, Inc.*, No. CV 10-04461 SJO (JCGx), 2010 WL 5289537, at *3 (C.D. Cal. Oct. 4, 2010) (citing *Circuit City Stores, Inc. v. Najd*, 294 F.3d 1104, 1009 (9th Cir. 2002), *aff'd*, 692 F. App'x 356 (9th Cir. 2017)) ("A party accepts the revised contract if it does not exercise a meaningful opportunity to 'opt out' provided by the other party to reject the offer.").  Similarly, failing to opt out can constitute assent to an arbitration contract when, among other things, the plaintiff has been informed of the significance of a failure to opt-out.  *See Circuit City Stores*, 294 F.3d at 1109; *see also Prizler v. Charter Commc'ns, LLC*,

---

[9]  According to Fries, the opt-out clause on the Solution Channel webpage also conditioned acceptance of the SCA on an employee's failure to opt out of the program in 30 days.  (*See* Fries Decl. ¶ 11 ("If you do not opt out of Solution Channel within the designated time, you will be automatically enrolled in Solution Channel and considered to have consented to the terms of the Mutual Arbitration Agreement at that time.").)  However, as the Court noted above (*see* footnote 6, *supra*), this language does not appear in the exhibit attached to the Motion.

Under the Federal Rules of Evidence, "[a]n original writing . . . is required in order to prove its content unless these rules or a federal statute provides otherwise."  Fed. R. Evid. 1002.  In this specific instance, the "original writing" is the Solution Channel webpage bearing this language.  This has not been provided by Defendants.  Further, Fries' recitation of this clause in his declaration does not fall under any exception to the hearsay rule.  The Fries Declaration is not itself "an admissible business record or summary of business records because it was prepared for litigation and not regularly kept as part of the practice of any business."  *See Alarcon v. Vital Recovery Servs., Inc.*, 706 F. App'x 394, 395 (9th Cir. 2017) (citing Fed. R. Evid. 803(6)).  It also does not serve as an admissible summary because Defendants have not alleged that the webpages associated with the Solution Channel Program are too voluminous to be conveniently examined, nor have they provided originals or duplicates of the webpage materials that accurately reflect the existence of this provision.  *See id.* (citing Fed. R. Evid. 1006).  Thus, the Court finds that this passage is not admissible and does not consider it in its analysis.  *See id.*

No. 3:18-CV-1724-L-MSB, 2019 WL 2269974, at *3 (S.D. Cal. May 28, 2019) (holding that a plaintiff's failure to opt out of Charter's Solution Channel program constituted implied consent to its terms necessary for contract formation); *Esquivel v. Charter Commc'ns, Inc.*, No. CV 18-7304-GW (MRWx), 2018 WL 10806904, at *7 (C.D. Cal. Dec. 6, 2018) (finding an employee's "silence (in the form of a failure to opt-out) a permissible expression of assent" where the employee received an email announcing the implementation of the arbitration agreement and the opportunity to opt-out and had a pre-existing employment relationship with the company); *Gentry v. Sup. Court*, 42 Cal. 4th 443, 468 (2007) (finding an employee "manifested his intent to use his silence, or failure to opt out, as a means of accepting the arbitration agreement"), *abrogated on other grounds by AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011).

Plaintiff points out that in some cases where a plaintiff signs a subsequent arbitration agreement before exercising an opt-out option, courts have held that the agreement supersedes any and all prior existing contracts. *See Stiner v. Brookdale Senior Living, Inc.*, 810 F. App'x 531, 533 (9th Cir. 2020) (affirming denial of motion to compel arbitration where a plaintiff's legal representative signed an agreement to arbitrate that superseded an earlier one and "[i]n that agreement, [the plaintiff] opted out of arbitration"); *Arredondo v. Sw. & Pac. Specialty Fin., Inc.*, No. 1:18-CV-01737-DAD-SKO, 2019 WL 4596776, at *6 (E.D. Cal. Sept. 23, 2019). However, a signature is a clear manifestation of assent. *See Marin Storage*, 89 Cal. App. 4th at 1049. Here, Plaintiff did not sign the SCA or allege any other conduct indicating assent before he elected to opt-out. *See Norcia*, 845 F.3d at 1284–87. Indeed, as explained above, Plaintiff's decision to opt-out eight days after receiving the SCA reflects the exact opposite. *See id.*; *Sawyer*, 2010 WL 5289537, at *3. The Court therefore finds *Stiner* and *Arredondo* easily distinguishable from the case at bar.

Thus, Plaintiff's argument that he entered into the SCA before opting out fails. Plaintiff did not mutually assent to the SCA upon receipt of the agreement, and he later affirmatively rejected the SCA when he timely opted out. *See Sawyer*, 2010 WL 5289537, at *3. For this reason, Plaintiff did not enter into the SCA such that it supersedes the JAMS

Agreement.  Having thus determined that the JAMS Agreement controls, the Court now turns to the Plaintiff's unconscionability arguments regarding that contract.

## B.    Unconscionability of the JAMS Agreement

Plaintiff argues that the JAMS Agreement should not be enforced because it is unconscionable.  (Opp'n at 7.)  "Like other contracts, arbitration agreements can be invalidated for fraud, duress, or unconscionability."  *Chavarria v. Ralphs Grocery Co.*, 733 F.3d 916, 921 (9th Cir. 2013).  As the party asserting unconscionability, Plaintiff bears the burden of proving the defense.  *Tompkins v. 23andMe, Inc.*, 840 F.3d 1016, 1023 (9th Cir. 2016) (citing *Sanchez v. Valencia Holding Co., LLC*, 61 Cal. 4th 899, 911 (2015)).

"Under California law, a contract must be both procedurally and substantively unconscionable to be rendered invalid."  *Chavarria*, 733 F.3d at 922 (citing *Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal. 4th 83, 114 (2000)).  Courts analyze "unconscionability on a sliding scale, so that the more substantively one-sided the contract term, the less evidence of procedural unconscionability is required to conclude that the term is unenforceable, and vice versa."  *Davis v. Kozak*, 53 Cal. App. 5th 897, 905 (2020).

### 1.    Procedural Unconscionability

"The procedural element of the unconscionability analysis concerns the manner in which the contract was negotiated and the circumstances of the parties at that time."  *Gatton v. T-Mobile USA, Inc.*, 152 Cal. App. 4th 571, 581 (2007) (citing *Kinney v. United HealthCare Servs., Inc.*, 70 Cal. App. 4th 1322, 1329 (1999)).  "The element focuses on oppression or surprise."  *Id.* (citing *Armendariz*, 24 Cal. 4th at 114).  "Oppression arises from an inequality of bargaining power that results in no real negotiation and an absence of meaningful choice."  *Id.* (citing *Flores v. Transam. HomeFirst, Inc.*, 93 Cal. App. 4th 846, 853 (2001)).  "Surprise is defined as 'the extent to which the supposedly agreed-upon terms of the bargain are hidden in the prolix printed form drafted by the party seeking to enforce the disputed terms.'"  *Id.* (quoting *Stirlen v. Supercuts, Inc.*, 51 Cal. App. 4th 1519, 1532 (1997)).  "The procedural element of an unconscionable contract generally takes the form of a contract of adhesion, which, imposed and drafted by the party of superior

- 13 -

bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it." *Little v. Auto Stiegler, Inc.*, 29 Cal. 4th 1064, 1071 (2003) (citation omitted).

(a)    <em>Contract of adhesion</em>

A procedural unconscionability analysis "begins with an inquiry into whether the contract is one of adhesion." *Armendariz*, 24 Cal. 4th at 113. Plaintiff states that the JAMS Agreement is a contract of adhesion because Plaintiff's acceptance of the agreement was a condition of his employment and he was not provided an opportunity to negotiate or reject its terms. (Sonico Decl. ¶¶ 5–7.)

"It is well settled that adhesion contracts in the employment context, that is, those contracts offered to employees on a take-it-or-leave-it basis, typically contain some aspects of procedural unconscionability." *Serpa v. Cal. Surety Investigations, Inc.*, 215 Cal. App. 4th 695, 704 (2013); *see also OTO, L.L.C. v. Kho*, 8 Cal. 5th 111, 126 (2019) ("Arbitration contracts imposed as a condition of employment are typically adhesive.").

The Court finds that the JAMS Agreement is no exception. As a TWC candidate for employment, Plaintiff was required to complete web-based onboarding before he could become employed. (*See* Cassidy Decl. ¶ 8.) The onboarding process in turn required that the candidate accept a number of "Required Acknowledgements," including the JAMS Agreement. (*See* Onboarding Status Details (listing "Arbitration Agreement" as a "Required Acknowledgment").) Most importantly, the JAMS Agreement itself states that "[b]y accepting employment with [TWC]," Plaintiff was agreeing to arbitrate employment-related claims. (JAMS Agreement at 1.) Because it was a condition of employment and Plaintiff had no opportunity to negotiate its terms, the JAMS Agreement constitutes a contract of adhesion. *Armendariz*, 24 Cal. 4th at 115. Therefore, it is somewhat procedurally unconscionable. *Baltazar v. Forever 21, Inc.*, 62 Cal. 4th 1237, 1244 (2016) ("Ordinary contracts of adhesion . . . contain a degree of procedural unconscionability even without any notable surprises, and bear within them the clear danger of oppression and overreaching.") (quotations and citations omitted).

An "ordinary contract of adhesion" such as this one, however, requires "closer scrutiny of its overall fairness" only where there is some "greater degree of procedural unconscionability" in the form of oppression or surprise.  *See id.* at 1246; *OTO*, 8 Cal. 5th at 126.    The Court therefore turns to Plaintiff's other claims of procedural unconscionability.[10]

(b)    *Oppression*

Plaintiff alleges that the JAMS Agreement is procedurally unconscionable because he was not provided an explanation of the terms, including his waiver of his constitutional rights, or an opportunity to review the terms of the contract or consult with an attorney. Defendants argue that consultations with an attorney or in-person explanations of the terms of the contract are of no import.  (Reply at 7.)

Defendants are only partly correct.  While Plaintiff has failed to show that the circumstances surrounding his acceptance of the JAMS Agreement warranted any explanation from defendants, whether Plaintiff had sufficient time to review the JAMS Agreement and was aided by an attorney are both relevant to determining whether the agreement is oppressive.  *See OTO*, 8 Cal. 5th at 127.

(i)    Explanation from Defendants

"No law requires that parties dealing at arm's length have a duty to explain to each other the terms of a written contract[.]'"  *Ramos v. Westlake Servs. LLC*, 242 Cal. App. 4th 674, 686 (2015) (quoting *Brookwood v. Bank of Am.*, 45 Cal. App. 4th 1667, 1674 (1996)). Further, because it is presumed that a party who accepts a document has "read it and understand its contents[,]" Plaintiff has the burden of overcoming this presumption and Defendants do not have to present "affirmative evidence that the agreements were

---

[10] Plaintiff does not raise any arguments concerning surprise.  In any event, the Court notes that the JAMS Agreement is a two-page contract that states in straightforward terms its purpose and conditions. This is not a prolix form hidden within a myriad of onboarding documents; in fact, given that TWC's onboarding process took place online, the JAMS Agreement was delineated by a separate link and therefore easy to discern from other required acknowledgments.  (*See* OBS Details.)  *Cf. Dougherty v. Roseville Heritage Partners*, 47 Cal. App. 5th 93, 104 (2020) (finding procedural unconscionability where an arbitration agreement was "buried" in the middle of a 70-page packet of hospital admission documents).

19cv1842

explained to [Plaintiff] or that [he] understood them . . . ."  *Baker v. Italian Maple Holdings, LLC*, 13 Cal. App. 5th 1152, 1163 (2017).  Plaintiff says only that he did not receive any explanation from Defendants about the JAMS Agreement (*see* Sonico Decl. ¶ 5); he does not state that he asked for and was refused an explanation from Defendants, or even that he did not understand the terms of the contract.  *See Martinez v. Vision Precision Holdings, LLC*, No. 1-19-CV-01002-DAD-JLT, 2019 WL 7290492, at *6 (E.D. Cal. Dec. 30, 2019) (finding no oppression where the plaintiff made no effort to ask the defendant for more time or assistance in reviewing an arbitration agreement).  Thus, the Court finds that Plaintiff's attestations do not overcome the presumption that he read and understood the JAMS Agreement.

### (ii)    Time to review the JAMS Agreement

Whether Plaintiff had sufficient time to consider the JAMS Agreement prior to accepting it requires closer scrutiny of the record.  TWC made Plaintiff an "online offer of employment" in 2014, which he accessed using the Onboarding System.  (Cassidy Decl. ¶ 9.)  The OBS System prompted Plaintiff to review and acknowledge 12 policies, the last of which was the JAMS Agreement.  (*Id.* ¶¶ 11–13.)  TWC instructed new hires to "complete the Onboarding process as soon as possible" but did not specify a time limit.  (OBS Checklist, Ex. C to Cassidy Decl.)  Moreover, the time stamps indicate that Plaintiff spent roughly 40 minutes reviewing the 12 policies, and took a little over 20 seconds to review the JAMS Agreement.  (*See* OBS Details.)  Plaintiff does not allege that this cursory review was subject to any time constraint—or, indeed, any other type of pressure—imposed by TWC, but offers only the conclusory attestation that he "do[es] not believe [he] had a meaningful opportunity to review any of the documents or policies presented to [him] during the on-boarding process[.]"  (Sonico Decl. ¶ 6.)  Without more, this conclusory statement is insufficient to support Plaintiff's claim that he did not receive enough time to review the JAMS Agreement.  *See Rejuso v. Brookdale Senior Living Communities, Inc.*, No. CV 17-5227 DMG (RAOx), 2018 WL 6174764, at *6 (C.D. Cal. June 5, 2018) (citing *Nigro v. Sears, Roebuck & Co.*, 784 F.3d 495, 497 (9th Cir. 2015)) (disregarding a self-

serving declaration that stated only conclusions and not facts that would be admissible evidence); *see also Ruiz*, 232 Cal. App. 4th at 842.

(iii)    Plaintiff's ability to consult counsel

The ability to talk to an attorney before signing an arbitration agreement is properly considered in assessing procedural unconscionability.  *See OTO*, 8 Cal. 5th at 127; *Swain v. LaserAway Med. Grp., Inc.*, 270 Cal. Rptr. 3d 786, 796 (2020), *as modified* (Nov. 3, 2020).  It is undisputed that Plaintiff did not sign the JAMS Agreement with the aid of an attorney.  However, Plaintiff does not explain why he was unable to secure an attorney before acknowledging the agreement.  *See Martinez*, 2019 WL 7290492, at *6.  For example, as aforementioned, he does not state that Defendants provided too little time to review the JAMS Agreement or otherwise exerted pressure on him to sign it, apart from that inherent in any contract proffered as a condition of employment.  *Cf. Swain*, 270 Cal. Rptr. 3d at 796 (finding absence of attorney, time constraints, and other pressure exerted by defendants gave rise to additional procedural unconscionability).

In light of this, the Court therefore finds that the absence of an attorney reflects some, though not any significant, level of oppression in the procedural unconscionability analysis. *See Martinez*, 2019 WL 7290492, at *6 ("[T]he fact that plaintiff may not have navigated the Agreement with the skill of a more sophisticated party does not render it 'highly oppressive.'").

(iv)    JAMS Rules

Lastly, Plaintiff alleges that Defendants' failure to provide a copy of the arbitration rules renders the JAMS Agreement procedurally unconscionable.  (Opp'n at 10.) Defendants instead provided a link to the JAMS rules on the onboarding webpage where the JAMS Agreement was located.  (Ex. C to Cassidy Decl.)

California courts have reached different conclusions about whether the failure to attach a copy of the rules renders a contract as a whole procedurally unconscionable.  *See Tiri v. Lucky Chances, Inc.*, 226 Cal. App. 4th 231, 246 n.9 (2014) (citing cases).  More recently, however, the California Supreme Court clarified that the failure to attach

- 17 -

1   arbitration rules to an arbitration agreement does not increase procedural unconscionability

2   where the plaintiff's challenge to the enforcement of the agreement does not "depend[] in

3   some manner on the arbitration rules in question." *Baltazar*, 62 Cal. 4th at 1246.

4          Here, Plaintiff's challenges to the enforcement of the JAMS Agreement do not

5   concern some aspect of the JAMS Rules themselves.   The sole substantive

6   unconscionability claim, discussed below, involves the agreement's jury trial waiver.   No

7   part of the JAMS Rules concern juries.   Moreover, the waiver of jury trials was contained

8   in the JAMS Agreement itself, not "artfully hidden" by the incorporation by reference of

9   the JAMS Rules by Defendants. *Cf. Ali v. Daylight Transp., LLC*, No. A157104, 2020 WL

10  7777912, at *9 (Dec. 4, 2020) (finding procedurally unconscionable the failure to attach

11  the rules where one claim of substantive unconscionability related to the requirement that

12  the plaintiff bear half the costs of arbitration, which was not included in the arbitration

13  agreement itself and only in the rules).

14         Plaintiff also does not argue that he was otherwise unable to access the rules via the

15  link or that he did not have enough time to read them at the time of contracting. *See Davis*,

16  53 Cal. App. 5th at 909; *see also Lane v. Francis Capital Mgmt. LLC*, 224 Cal. App. 4th

17  676, 691 (2014) (holding failing to attach rules to arbitration agreement did not render the

18  agreement procedurally unconscionable because rules were easily accessible on the

19  internet and the plaintiff did not lack means or capacity to retrieve them).   Thus, the Court

20  concludes Defendants' failure to provide a copy of the JAMS Rules with the JAMS

21  Agreement does not add to the level of procedural unconscionability.

22         In sum, aside from the standard adhesive nature of the JAMS Agreement, the Court

23  finds some additional procedural unconscionability only in the fact that Plaintiff did not

24  have the aid of an attorney.   Plaintiff's remaining arguments do not militate in favor of

25  procedural unconscionability.   Thus, there is a low degree of procedural unconscionability.

26                 2.   Substantive Unconscionability

27         When the degree of procedural unconscionability of an adhesion contract is low,

28  "the agreement will be enforceable unless the degree of substantive unconscionability is

high." *Poublon v. C.H. Robinson Co.*, 846 F.3d 1251, 1263 (9th Cir. 2017) (citing *Serpa*, 215 Cal. App. 4th at 704). Substantive unconscionability focuses on the harshness and one-sided nature of the substantive terms of the contract. *A & M Produce Co. v. FMC Corp.*, 135 Cal. App. 3d 473, 486–87 (1982). "Substantive unconscionability 'may take various forms,' but typically is found in the employment context when the arbitration agreement is 'one-sided' in favor of the employer without sufficient justification, for example, when 'the employee's claims against the employer, but not the employer's claims against the employee, are subject to arbitration.'" *Serpa*, 215 Cal. App. 4th at 703 (quoting *Little*, 29 Cal. 4th at 1071).

The Supreme Court of California has held that governing California constitutional and statutory provisions do not permit predispute jury waivers. *Grafton Partners v. Superior Court*, 36 Cal. 4th 944, 967 (2005). Recent decisions have applied *Grafton* to hold that provisions requiring "plaintiffs to waive in advance their right to a jury trial for any dispute for which arbitration is not allowed by law" are unconscionable under California law. *Dougherty*, 47 Cal. App. 5th at 107; *Durruthy v. Charter Commc'ns, LLC*, No. 20-CV-1374-W-MSB, 2020 WL 6871048, at *12 (S.D. Cal. Nov. 23, 2020) (citing *Dougherty* to find predispute jury trial waiver "clearly" unconscionable under California law); *see also Lange v. Monster Energy Co.*, 46 Cal. App. 5th 436, 452 (2020) (finding provision that required both parties, "in the event that any controversy or claim is determined in a court of law," to "irrevocably waive" right to a jury trial for disputes covered by contract was "not susceptible to any interpretation other than as an unconscionable predispute jury trial waiver").[11]

---

[11] At least one district court has declined to hold, as a matter of law, "that a trial to a court rather than a jury favors any party in any degree." *Phoenix Leasing. v. Sure Broadcasting, Inc.*, 843 F. Supp. 1379, 1385 (D. Nev. 1994) (construing federal and California law regarding jury trial waiver to find that because "[t]here is no presumption that a trial to a court is unconscionably more favorable to a lender than to a jury trial"), *aff'd*, 89 F.3d 846 (9th Cir. 1996). However, given the intervening state court decisions cited above, the Court finds that the reasoning in *Phoenix Leasing* is no longer supported by prevailing state law, which governs unconscionability. *See Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 682 (1996) ("Generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening § 2 [of the FAA].").

The relevant provision in the JAMS Agreement states:

> In the event a dispute between you and TWC is not arbitrable under this Agreement for any reason and is pursued in court, you and TWC agree to waive any right to a jury trial that might otherwise exist.

(JAMS Agreement at 2.)  In other words, this clause requires Plaintiff to waive his right to a jury trial if he raises an employment issue that cannot proceed to arbitration.  This is therefore a predispute jury trial waiver prohibited by California law.  *See Dougherty*, 47 Cal. App. 5th at 107.  The provision is therefore substantively unconscionable.

### 3.  Severance

Under California law, courts have discretion to sever an unconscionable provision or refuse to enforce the contract in its entirety.  *See* Cal. Civ. Code § 1670.5(a).  The relevant provision states:

> If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.

*Id.*  The California Supreme Court "has interpreted this provision to mean that if a trial court concludes that an arbitration agreement contains unconscionable terms, it then 'must determine whether these terms should be severed, or whether instead the arbitration agreement as a whole should be invalidated.'"  *Lange*, 46 Cal. App. 5th at 452–53 (quoting *Gentry*, 42 Cal. 4th at 473).  California courts have further held that "the strong legislative and judicial preference is to sever the offending term and enforce the balance of the agreement[,]" noting that refusing to enforce an entire agreement is "contemplate[d] . . . only when an agreement is 'permeated' by unconscionability.'"  *Id.* at 453 (alterations in original) (quoting *Roman v. Sup. Court*, 172 Cal. App. 4th 1462, 1478 (2009)); *see also Armendariz*, 24 Cal. 4th at 124 ("If the central purpose of the contract is tainted with illegality, then the contract as a whole cannot be enforced.  If the illegality is collateral to the main purpose of the contract, and the illegal provision can be extirpated from the

contract by means of severance or restriction, then such severance and restriction are appropriate.").

Plaintiff argues that the substantively unconscionable waiver "irreparably taints the entire contract." (Opp'n at 11–12.) Defendants disagree, arguing that severance is appropriate here where the contract contains a severability provision. While California law is unequivocal about the unconscionability of the waiver provision, the Court finds that it does not permeate the entire JAMS Agreement with unconscionability such that it cannot be severed.

Preliminarily, the Court notes that the JAMS Agreement contains the following severability provision:

> You and TWC agree that if the Agreement or any clause or term of the Agreement is found to be void, unenforceable, or unconscionable, the remainder of the Agreement shall be enforced without the invalid, unenforceable, or unconscionable clause or term, or the application of the clause or term shall be limited as to avoid any invalid, unenforceable, or unconscionable result.

(JAMS Agreement at 2.) *See Grabowski v. Robinson*, 817 F. Supp. 2d 1159, 1179 (S.D. Cal. 2011) (considering severability clause); *see also Lang v. Skytap, Inc.*, 347 F. Supp. 3d 420, 433 (N.D. Cal. 2018) (same).

When determining whether unconscionability permeates an arbitration agreement, courts consider several factors: (1) whether there are multiple unconscionable provisions; (2) whether the central purpose of the contract is illegal; and (3) whether the court can eliminate the unconscionability from the contract by striking or restricting provisions— instead of rewriting or reforming the agreement. *See, e.g., Poublon*, 846 F.3d at 1272–73 (citing cases); *see also Armendariz*, 24 Cal. 4th at 124–25.

The factors favor severing the waiver provision. First, the waiver is the sole unconscionable provision in the JAMS Agreement. *See Butterfield v. Fedex Office*, No. SA CV 18-00033 AG (KESx), 2018 WL 5919208, at *3 (C.D. Cal. July 16, 2018) (concluding that a jury trial waiver did not "'permeate' the rest of the agreement such that

compelling arbitration would be inappropriate"); *cf. Lange*, 46 Cal. App. 5th at 451–52, 455 (finding provisions waiving the right to punitive damages as remedy for all nonstatutory claims, the requirement that the employer establish all essential elements for issuance of injunction, and the right to a jury trial together permeated contract "with too high a degree of unconscionability for severance to rehabilitate"); *Dougherty*, 47 Cal. App. 5th at 101, 107 (finding no abuse of discretion where trial court declined to sever "multiple defects" in arbitration agreement, including "restrictions on discovery, limitations on damages, and advance waiver of jury trial rights for any nonarbitrable causes of action").

Second, the central purpose of the JAMS Agreement is to mandate arbitration of employment-related claims, which is indisputably lawful. The objective of the jury trial waiver is clearly collateral to this central purpose because the waiver intends to require bench trials for any disputes that *cannot* be subject to the agreement's mandate. *See Armendariz*, 24 Cal. 4th at 124.

Third, the jury trial waiver is a single sentence that does not rely on or create any conditions for other provisions in the JAMS Agreement; it can therefore be easily stricken without requiring "reform[ing] the contract by augmenting it or otherwise rewriting the parties' agreement." *Conyer v. Hula Media Servs., LLC*, 53 Cal. App. 5th 1189, 1198 (2020).

Because the Court finds the JAMS Agreement is not permeated with unconscionability, severing the jury trial waiver from the contract under California Civil Code § 1670.5(a) is appropriate. The Court thus ultimately rejects Plaintiff's unconscionability defense to enforcement of the JAMS Agreement, and the Court will compel arbitration upon severing the provision from the contract.

## IV.   CONCLUSION

In light of the foregoing, the Court **GRANTS** Defendant's Renewed Motion to Compel Arbitration (ECF No. 36) under the JAMS Agreement. Specifically, the Court severs the predispute jury trial waiver from the JAMS Agreement discussed above. The Court also **ORDERS** the parties to proceed to arbitration in California in the manner

provided for in the JAMS Agreement.  *See* 9 U.S.C. § 4.  In addition, the Court **STAYS** this action.  *See id.* § 3.

Last, the Court directs the Clerk of Court to **ADMINISTRATIVELY CLOSE** this case.  The decision to administratively close this case pending resolution of the arbitration does not have any jurisdictional effect.  *See Dees v. Billy*, 394 F.3d 1290, 1294 (9th Cir. 2005) ("[A] district court order staying judicial proceedings and compelling arbitration is not appealable even if accompanied by an administrative closing.    An order administratively closing a case is a docket management tool that has no jurisdictional effect.").

**IT IS SO ORDERED.**

**DATED:  January 27, 2021**

Hon. Cynthia Bashant
United States District Judge

19cv1842